**Reverse and Render; Opinion Filed November 12, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00195-CV

### AEG POWER SOLUTIONS GMBH, Appellant
### V.
### CREATION TECHNOLOGIES TEXAS, LLC, Appellee

**On Appeal from the 14th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-15065**

## MEMORANDUM OPINION
Before Justices Myers, Osborne, and Nowell
Opinion by Justice Myers

This is an accelerated interlocutory appeal from an order denying appellant AEG Power Solutions GmbH's special appearance. In one issue, it argues the trial court erred in denying the special appearance because the record does not support specific personal jurisdiction. We reverse and render judgment dismissing for lack of jurisdiction.

### BACKGROUND AND PROCEDURAL HISTORY

In September of 2012, Creation Technologies Texas, LLC ("Creation"), a Texas company, entered into a Manufacturing Agreement with a Texas-based company, AEG Power Solutions USA, Inc., subsequently known as 3W Power Solutions USA, Inc. ("AEG USA"). In line with the Manufacturing Agreement, AEG USA placed purchase orders with Creation in June of 2013 for the manufacture of solar inverters, which convert the output of a solar panel into a utility frequency. These purchase orders were placed, at least in part, to fulfill an order from another

company, Power Max Co., Ltd., which was in the business of, among other things, developing and selling solar electric power plants in Japan to investors. Power Max, however, failed to pay AEG USA, and by January of 2014 AEG USA owed Creation over $2 million under the terms of the Manufacturing Agreement. In February of 2014, AEG USA entered into a Security Agreement with Creation to avoid termination of the Manufacturing Agreement. The Security Agreement, executed in the Netherlands on AEG USA's behalf by Jeffrey Casper, a non-Texas resident, gave Creation a continuing security interest in AEG USA's accounts, equipment, and inventory.

AEG USA, meanwhile, sued Power Max in a Texas court in June of 2015 for breach of contract, and the case was removed to federal court in October of 2015. AEG USA subsequently settled the case, and the proceeds of the settlement were paid to Creation, which had intervened in the case.[1]

AEG USA is the United States subsidiary of AEG Power Solutions, B.V., its Dutch parent company ("AEG Power Solutions"). In March of 2017, Creation's German counsel wrote to the general counsel for AEG Power Solutions' German subsidiary, AEG Power Solutions GmbH ("AEG Germany"). This letter stated that it appeared AEG USA had defaulted under the terms of the Manufacturing Agreement and had "only accepted (and paid) a rather small portion of the goods ordered under the Manufacturing Agreement." The letter also stated that "[t]he aggregate amount owed to Creation at this stage amounts to approx. $5 million, plus interest," and noted that AEG USA had "closed down its R&D and sales office in the United States and has transferred the existing products and activities to AEG [Germany]." AEG Germany was in insolvency proceedings in Germany at the time, as acknowledged in Creation's letter, and the letter noted that

---

[1] We take judicial notice of the United States District Court for the Eastern District of Texas, Sherman Division's November 7, 2016 corrected memorandum opinion and order granting in part plaintiff's motion for summary judgment and denying defendant's motion for partial summary judgment; the court's order of March 21, 2017; the parties' joint status report of March 31, 2017; and the court's agreed order of dismissal of June 16, 2017. *See, e.g., 3W Power USA, Inc. f/k/a AEG Power Solutions USA, Inc. v. PowerMax Co., Ltd.*, Case No. 4:15-CV-677, 2016 WL 6581996 (E. D. Tex. Nov. 7, 2016).

counsel had "been asked to assist our US co-counsel in possible legal action in federal court in Dallas County, Texas against" AEG USA, AEG Germany, and "other associated enterprises." In December of 2017, Creation's German counsel made a demand upon AEG Germany for $8.976 million. On August 3, 2018, two months before the underlying lawsuit was filed, Creation's Texas counsel sent a letter to AEG Germany notifying it to preserve evidence and electronically stored information. Attached to the letter was a draft of a complaint to be filed in the judicial district court of Dallas County, Texas.

According to the declaration of Paul Van Der Harten, the chief financial officer of AEG Power Solutions Group and the managing director of AEG Germany, AEG Germany is a German company headquartered in Warstein, Germany. Jeffrey Casper—currently the CEO of AEG Power Solutions and, at the time of the events that formed the basis for the underlying lawsuit, a director for AEG USA and AEG Power Solution's chief restructuring officer and chief financial officer—states in his January 31, 2019 declaration[2] that AEG Germany was formed under the laws of Germany in Warstein-Belecke, "registered at the District Court of Arnsberg." Casper declares that, like its sister company AEG USA, AEG Germany is a subsidiary of AEG Power Solutions "and was not part of the decision to enter into the Manufacturing Agreement," nor was it "a party thereto." Casper adds that AEG Germany was not a part of the "order process" with Power Max and AEG USA, nor was it a party to the Security Agreement between AEG USA and Creation.

Casper states in his declaration that, as a German company, AEG Germany files its tax returns in Germany. Additionally, "[d]uring the relevant time period," AEG Germany "employed individuals in Germany," "paid them for their services," and "provided them with benefits including health care." "AEG Germany maintains separate and distinct bank accounts from any of the other defendants," and "[t]o the extent there were any intra-company transfer of funds, those

---

[2] Casper supplied two declarations.

transfers were documented, and Germany was required to repay the transferor." "In situations where common positions were used to provide services to different subsidiaries," such as the general counsel position, "AEG Germany would pay a share of that person's salary." "AEG Germany does not have any bank accounts, real property, offices, employees or agents in Texas."

Casper's declaration explains that AEG Germany "manufacturers and distributes products in the oil & gas segment in compliance with the International Electrotechnical Commission ('IEC') standards which are recognized worldwide with the exception of a few countries, including the United States, and Japan." Casper states: "AEG Germany does not manufacture, market, sell, or distribute products in the oil & gas segment anywhere in the United States, which requires compliance with standards set by Underwriters Laboratories, Inc. ('UL')." AEG Germany's IEC-compliant products cannot "be used in the United States because they are not UL-compliant," according to Casper. Regarding the Germany insolvency proceedings, Casper states that AEG Germany went through insolvency proceedings in Germany beginning on November 22, 2016, and continuing through the first two quarters of 2017, with a final order dated May 1, 2017. Casper adds that "Creation did not file any claims in those proceedings."

According to Van Der Harten's declaration, AEG Germany has not agreed to perform a contract in whole or part in Texas; it does not own real property or have any assets in Texas; it does not maintain an office or other point of contact in Texas; it has not purposefully availed itself of the privilege of conducting activities in Texas; it has not solicited business in Texas or with any person or entity in Texas; it does not maintain a registered agent in Texas; and it has not committed a tort or statutory violation in Texas.

Van Der Harten's declaration acknowledges that, after the execution of the Security Agreement, AEG Germany "facilitated the sale of component parts of the inverters (originally ordered by AEG Power Solutions USA) to companies outside of the United States to mitigate

[Creation's] damages." Van Der Harten states that, as part of this effort, AEG Germany "paid [Creation] directly based on invoices from [Creation]." Invoices from Creation that are included in the record show there were six individual sales from Creation to AEG Germany. The dates on these invoices indicate the sales took place on 4/30/15, 9/1/15, 10/29/15, 12/16/15, 7/12/16, and 7/14/16. However, Van Der Harten signals that there was no previous or ongoing business relationship between Creation and AEG Germany, stating that "[n]o other agreements, contracts, or purchase orders have been entered into between AEG [Germany] and a Texas company." Furthermore, according to Van Der Harten, AEG Germany "has never sold any inverters" and "no inverters or inverter components were sold by AEG [Germany] in the State of Texas."

On October 3, 2018, Creation filed the underlying lawsuit against AEG Power Solutions; AEG USA; AEG Germany; AEG Power Solutions Sdn Bhd, AEG Power Solutions' Malaysian subsidiary ("AEG Malaysia"); 3W Power S.A., AEG Power Solutions' Luxembourg-based holding company ("AEG Luxembourg"); and Jeffrey Casper (collectively, "the AEG Defendants"). This lawsuit seeks millions of dollars allegedly owed to Creation for the manufacture of commercial solar inverters under theories of alter ego, breach of the written Security Agreement, fraud, fraudulent transfer, and negligent misrepresentation.

An amended petition was filed by Creation on November 5, 2018. AEG Luxembourg, AEG Power Solutions, and AEG Germany all filed special appearances that argued Creation had not alleged sufficient contacts or other conduct with Texas to warrant the exercise of personal jurisdiction. AEG Malaysia and Jeffrey Casper were not named as parties in the amended petition, and, after the filing of the special appearances, Creation non-suited AEG Luxembourg, leaving AEG USA, AEG Power Solutions, and AEG Germany.

Creation's response to the special appearances argued that AEG Germany was subject to specific jurisdiction in Texas because it had purposefully availed itself of conducting activities in

Texas, and that AEG Power Solutions was subject to both general and specific jurisdiction in Texas. After holding a hearing on both special appearances and listening to the arguments of counsel, the trial court signed separate orders granting AEG Power Solution's special appearance and denying AEG Germany's special appearance. This accelerated interlocutory appeal concerns the special appearance brought by AEG Germany.

## PERSONAL JURISDICTION

Texas courts may exercise personal jurisdiction over a nonresident defendant "when the state's long-arm statute authorizes such jurisdiction and its exercise comports with due process." *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 70 (Tex. 2016). The Texas long-arm statute provides in relevant part that "[i]n addition to other acts that may constitute doing business," a nonresident does business in Texas if the nonresident contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state, or if the nonresident commits a tort in whole or in part in this state. TEX. CIV. PRAC. & REM. CODE ANN. § 17.042(1), (2). The statute "provides for personal jurisdiction that extends to the limits of the United States Constitution, and so federal due process requirements shape the contours of Texas courts' jurisdictional reach." *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016).

"[W]hether a trial court's exercise of jurisdiction is consistent with due process requirements turns on two requirements: (1) the defendant must have established minimum contacts with the forum state; and (2) the assertion of jurisdiction cannot offend traditional notions of fair play and substantial justice." *Id*. (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "[S]ufficient minimum contacts exist when the nonresident defendant 'purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws.'" *Id*. at 66–67 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253

(1958)). "The nub of the purposeful availment analysis is whether a nonresident defendant's conduct in and connection with Texas are such that it could reasonably anticipate being haled into court here." *Id*. at 67. The defendant must purposefully direct contacts into the forum state. *Id*. (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991)).

When determining whether a nonresident purposefully availed itself of the privilege of conducting activities in Texas, we consider three factors: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person; (2) the contacts relied upon must be purposeful rather than random, isolated, or fortuitous; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction. *Cornerstone,* 493 S.W.3d at 70–71. This analysis assesses the quality and nature of the contacts, not the quantity. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151 (Tex. 2013). A defendant will not be haled into a jurisdiction based solely on contacts that are random, isolated, or fortuitous, or on the unilateral activity of another party or a third person. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005); *Guardian Royal Exch.*, 815 S.W.2d at 226.

In addition to minimum contacts, due process requires the exercise of personal jurisdiction to comply with traditional notions of fair play and substantial justice. *Moncrief Oil Int'l,* 414 S.W.3d at 154 (citing *Retamco Operating, Inc. v. Republic Drilling Co*., 278 S.W.3d 333, 338 (Tex. 2009)). The evaluation is undertaken in light of these factors, when appropriate:

> (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate or international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several nations or states in furthering fundamental substantive social policies.

*Spir Star AG v. Kimich*, 310 S.W.3d 868, 878 (Tex. 2010).

The plaintiff bears the initial burden of pleading allegations that suffice to permit a court's

exercise of personal jurisdiction over the nonresident defendant. *Searcy*, 496 S.W.3d at 66. Once the plaintiff has met this burden, the defendant then assumes the burden of negating all potential bases for personal jurisdiction that exist in the plaintiff's pleadings. *Id*. The defendant can negate jurisdiction on either a factual or legal basis. *Kelly v. Gen. Interior Constr., Inc*., 301 S.W.3d 653, 659 (Tex. 2010). A defendant negates jurisdiction on a factual basis by presenting evidence to disprove the plaintiff's jurisdictional allegations. *Id.* "The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction." *Id*. (footnotes omitted). A defendant negates jurisdiction on a legal basis by showing that "even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction." *Id*. A defendant's contacts with a forum may give rise to either general or specific jurisdiction. *KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd., L.L.P.*, 384 S.W.3d 389, 392 (Tex. App.—Dallas 2012, no pet.).

Creation does not argue that general jurisdiction is available over AEG Germany. Our inquiry is therefore confined to specific jurisdiction, which is based on "whether the defendant's activities in the forum state themselves 'give rise to the liabilities sued on.'" *Searcy*, 496 S.W.3d at 67 (quoting *Int'l Shoe*, 326 U.S. at 317). Specific jurisdiction exists when the plaintiff's claims "arise out of" or are "related to" the defendant's contacts with the forum. *Id*. (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 9 (1984)). "[T]he *defendant's* relationship, not the *plaintiff's* relationship, with the forum state is the proper focus of the specific jurisdiction analysis; that is, courts must consider the relationship between the defendant, the forum state, and the litigation." *Id.*

"'[F]or a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation.'" *Moncrief Oil Int'l,* 414 S.W.3d at 156 (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007)). "[B]ut-for causation alone is insufficient." *Id*. at 157; *see also Leonard v. Salinas Concrete*, LP, 470 S.W.3d 178, 188 (Tex. App.—Dallas 2015, no pet.). "'The operative facts are those on which the trial will focus to prove the liability of the defendant who is challenging jurisdiction.'" *Leonard*, 470 S.W.3d at 188 (quoting *Kaye/Bassman Int'l Corp. v. Dhanuka*, 418 S.W.3d 352, 357 (Tex. App.—Dallas 2013, no pet.)). "[S]pecific jurisdiction requires us to analyze the jurisdictional contacts on a claim-by-claim basis." *Moncrief Oil Int'l,* 414 S.W.3d at 150.

## STANDARD OF REVIEW

The question of whether a court has personal jurisdiction over a nonresident defendant is a question of law we review de novo. *Moncrief Oil Int'l,* 414 S.W.3d at 150 (citing *Moki Mac River Expeditions*, 221 S.W.3d at 574). "When, as here, the trial court does not issue findings of fact and conclusions of law, we imply all relevant facts necessary to support the judgment that are supported by evidence." *Id*. (citing *Retamco Operating, Inc*., 278 S.W.3d at 337).

## DISCUSSION

In its sole issue on appeal, AEG Germany argues the trial court could not exercise personal jurisdiction over it because AEG Germany had negligible contacts with Texas, none of which give rise to Creation's claims, and that the court therefore erred in denying AEG Germany's special appearance.

Creation's argument for specific jurisdiction over AEG Germany is that AEG Germany was the improper recipient of goods fraudulently transferred to it by AEG USA, thus creating specific jurisdiction. Creation argues that AEG Germany had sufficient minimum contacts with

Texas because it purposefully and actively intended to defraud Creation, a Texas company, by intentionally violating the Texas Uniform Fraudulent Transfer Act ("TUFTA"), and by taking possession of assets it knew Creation had a valid security interest in. *See, e.g., Challenger Gaming Solutions, Inc. v. Earp*, 402 S.W.3d 290, 295 (Tex. App.—Dallas 2013, no pet) (fraudulent transfer under TUFTA is a tort). But according to AEG Germany, this argument fails because (1) AEG Germany negated Creation's jurisdictional facts and shifted the burden back to Creation by offering evidence no transfer occurred; and (2) receiving fraudulently transferred goods does not create jurisdiction as a matter of law.

Creation directs our attention to a December 29, 2013 email Jeffrey Casper sent to John Taylor, vice president of sales with AEG Power Solutions, and to Roger de Vries, vice president of reporting and control. In that email, titled "RE: Japan Office—strictly confidential between YOU and ME," Casper wrote:

> So we have an inventory commitment of 5m USD to support this activity that I want to get out of . . . .
>
> . . . . In the meantime, we will transfer the MPV to Belecke. We will reduce Dallas to 3 people and by end of March be done with it. Agreed. We will dispute what is left with supplier and, if necessary bankrupt the thing. If you agree let me know. If you don't, and don't want to take on this added issue also tell me. But I do need to decide on Japan.

Creation interprets this email as Casper proposing to sell the inventory elsewhere while simultaneously (1) transferring the solar inverter work (referred to in the email as MPV) to Warstein-Belecke, Germany, where AEG Germany is headquartered; (2) reducing the Dallas office to three people; (3) disputing the remaining inventory with Creation; and (4) bankrupting AEG USA if necessary.

Creation also cites a passage from AEG Power Solution's 2014 annual report that allegedly described the shuttering of AEG USA. The report explained to shareholders that "[t]he existing products and activities were subsequently transferred to the Group's German subsidiary and the

–10–

office closed at the end of April 2014. The Group maintains a sales and support presence in the United States." In a letter to stakeholders that was part of the same annual report, Jeffrey Casper stated that "the Company initiated plans to close down its R&D and sales office in Richardson, Texas, USA," and that "[t]his entity consistently operated at a loss and continued to consume cash." It also stated that "[a]fter existing products and activities were transferred to our German subsidiary, the U.S. office ceased activity at the end of April 2014." According to Creation, this confirmed the closing of AEG USA and the transfer of its assets to AEG Germany, in violation of the Security Agreement. Moreover, Casper was serving as the director of AEG Germany when AEG USA was shut down and its assets allegedly transferred to AEG Germany. As Creation argues, "Casper wheeled and dealed on behalf of whichever AEG entity benefitted AEG's bottom line, in this case AEG Germany, without regard to corporate formalities and with knowledge that his actions on behalf of AEG was done with the intent to not honor the agreements AEG USA had entered into."

AEG Germany, however, responds that the above reference to the transfer of assets to Germany is a "misstatement," and it directs our attention to the portion of Casper's January 31, 2019 declaration that states: "Creation has not identified the assets it claims were improperly transferred by [AEG] USA to AEG Germany. I am not aware of any assets being improperly transferred from [AEG] USA to AEG Germany. Furthermore, Creation has not taken a judgment against [AEG] USA." AEG Germany contends that Creation has not rebutted this evidence, having failed to identify any improperly transferred assets in its discovery responses or filings, and that there is no competent evidence in this record showing an actual transfer of assets occurred. As for the email, AEG Germany calls it a "red herring" because what Casper "suggested" in the email, i.e., putting AEG USA into bankruptcy and transferring its assets to "Belecke," never happened.

As part of its argument, Creation also cites to three decisions from federal courts, contending that under the "effects test" of *Calder v. Jones*, 465 U.S. 783 (1984), jurisdiction is proper over AEG Germany because of its alleged receipt of AEG USA's fraudulently transferred assets. *See Mullins v. TestAmerica, Inc.*, 564 F.3d 386 (5th Cir. 2009); *Dontos v. Vendomation NZ Ltd.*, 582 Fed.Appx. 338 (5th Cir. 2014); *Sourcing Mgmt., Inc. v. Simclar, Inc.*, 118 F.Supp.3d 899 (N.D. Tex. 2015). But this reliance is misplaced. In fact, all three cases are not only factually dissimilar to this case, but they show that the alleged contacts in this instance do not rise to the level of purposeful availment.

In *Mullins*, a Texas creditor sued a debtor and related parties who had subsequently received funds alleged to have been transferred fraudulently in violation of TUFTA. *Mullins*, 564 F.3d at 398. The Fifth Circuit upheld the district court's exercise of personal jurisdiction over defendants who had no contacts with the forum state of Texas apart from their alleged involvement in a fraudulent transfer scheme, concluding they had "purposefully aimed their conduct at . . . Texas . . . with the knowledge that their conduct would allegedly impair the rights of a single, major creditor and Texas resident under agreements that center around Texas." *Id*.

The Fifth Circuit reached this conclusion based on the "effects" test, which, as described by the Fifth Circuit, provides that "'an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct.'" *Mullins*, 564 F.3d at 400 (quoting *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999)). The Fifth Circuit noted that "the 'effects' test in *Calder* does not supplant the need to demonstrate minimum contacts that constitute purposeful availment, that is, conduct by the non-resident defendant that invoked the benefits and protections of the state or was otherwise purposefully directed toward a state resident." *Id*. at 400. Moreover, "[k]nowingly

–12–

accepting a fraudulent transfer may subject a transferee to liability, but such conduct is not necessarily tantamount to committing a wrongful act purposefully aimed at a creditor of the transferor *in his state of residence*." *Id*. at 400–01. The court expressed doubt that *Calder* established personal jurisdiction "over the recipient of a fraudulent transfer anywhere a complaining creditor files suit simply by virtue of the creditor's residence in that forum." *Id*. at 401.

However, the Fifth Circuit concluded there was personal jurisdiction over the defendants because the Texas-based plaintiff/creditor, Faraway, had been targeted and singled out by the defendants, Sagaponack (a partnership in which none of the partners was a Texas citizen) and Weisman (also not a citizen of Texas), and that the defendants intended to block any sale that included a distribution of assets to that specific creditor. *See id*. at 401–02. As the court pointed out, "the evidence in this case demonstrates both that Faraway was no ordinary creditor . . . and Sagaponack was far from a passive transferee." *Id*. at 401. Moreover, the note and purchase agreement were expressly governed by Texas law and the debtor-creditor relationship was centered in Texas. *Id*. at 402. The court concluded:

> . . . Sagaponack purposefully aimed its conduct at Faraway in Texas by ensuring that a portion of its own notes would be paid while knowing that Faraway's would not. It is therefore no "mere fortuity" that Sagaponack's conduct would cause injury to Faraway in Texas. Under these circumstances, we find that Sagaponack should reasonably have anticipated being haled into a Texas court for precipitating and directing an alleged fraudulent transfer at the expense of a known, major creditor in Texas whose right to payment arises out of contracts that share a strong connection with Texas.

*Id*. (citation omitted). The court likewise concluded that "Weisman's alleged conduct in engineering a transfer that knowingly impaired the rights of a Texas resident under agreements centered in Texas substantiates that he purposefully aimed his intentionally tortious conduct at the forum state." *Id*. at 403.

Two other "effects test" cases cited by Creation, *Dontos* and *Sourcing Management*, are

no more helpful to its position. In *Dontos*, an unpublished opinion, the Fifth Circuit held that personal jurisdiction over out-of-state defendants was present where a Texas creditor/plaintiff alleged that the defendants participated in a scheme to fraudulently transfer assets to prevent the creditor/plaintiff from collecting a pre-exiting Texas judgment, in violation of TUFTA. *Dontos*, 582 Fed.Appx. at 345–48. In explaining its conclusion that there was personal jurisdiction over the defendants, the court stated that "[a]s the Texas Supreme Court has explained, when a nonresident defendant receives Texas property or a Texas contract, for the purpose of defrauding a Texas resident, the nonresident defendant is subject to suit in Texas courts." *Id*. at 347 (citing *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 341 (Tex. 2009)). Similarly, in *Sourcing Management*, which involved a Texas creditor attempting to collect on its Texas judgment, the court concluded, citing *Mullins*, *Dontos*, and *Retamco*, that the plaintiff "made a prima facie showing that [the defendant] established minimum contacts with Texas sufficient for this court to exercise specific jurisdiction over [the defendant]" when the defendant "intentionally impaired [the plaintiffs'] ability to collect on its Texas judgment . . . by colluding to transfer [another defendants'] assets via a private foreclosure sale." *Sourcing Mgmt.*, 118 F.Supp.3d at 910–11.

The Texas Supreme Court has likewise concluded that "the 'effects test' is not an alternative to our traditional 'minimum contacts' analysis, and it does not displace the factors we look to in determining whether a defendant purposefully availed itself of the state." *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 565 (Tex. 2018) (concluding that even if the defendant's receipt of funds was "part of an elaborate fraudulent-transfer scheme, her contacts do not establish purposeful availment of the state of Texas" because "she transferred a fungible asset—money—with no continuing presence in Texas, and the mere act of accepting the transfer of money drawn on a Texas bank is 'of negligible significance for purposes of determining whether

[a foreign defendant] had sufficient contacts in Texas.'") (quoting *Helicopteros,* 466 U.S. at 416–17). The court also stated "that the test laid out in *Calder* requires that the 'effects' of the alleged tort must connect the defendant to the forum state itself, not just to a plaintiff who lives there." *Id.* at 564 (citing *Walden v. Fiore*, 571 U.S. 277, 288 (2014)). "Moreover, we have explicitly rejected an approach to specific jurisdiction that turns upon where a defendant 'directed a tort' rather than on the defendant's contacts." *Id.* at 565.

In this case, AEG Germany was not a party to the Manufacturing Agreement or the Security Agreement; it was not involved in the "order process" with Power Max and AEG USA; nor was it a party to AEG USA's lawsuit against Power Max. In fact, Creation has not alleged any contacts by AEG Germany with the state of Texas that "give rise" to Creation's claims against it, apart from the allegation that AEG Germany was the recipient of fraudulently transferred assets. Yet Creation has not even shown that a transfer of assets to AEG Germany occurred (obviously necessary for a fraudulent transfer claim), much less that it was fraudulent, or, in fact, what was actually transferred. Moreover, as the above cases show, even if we assume a tort was somehow committed and that AEG Germany knew its actions would cause an injury in Texas (assumptions this record does not support), the alleged contacts do not rise to the level of purposeful availment simply because Creation is a Texas company or the alleged harm occurred in Texas. *See, e.g., Old Republic Nat'l Title Ins. Co.*, 549 S.W.3d at 565.

We decide AEG Germany's issue in its favor. We reverse the trial court's order and render judgment dismissing Creation's claims against AEG Germany for lack of jurisdiction.

/Lana Myers/
LANA MYERS
JUSTICE

190195F.P05

–15–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

AEG POWER SOLUTIONS GMBH,
Appellant

No. 05-19-00195-CV     V.

CREATION TECHNOLOGIES TEXAS,
LLC, Appellee

On Appeal from the 14th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-18-15065.
Opinion delivered by Justice Myers.
Justices Osborne and Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** dismissing CREATION TECHNOLOGIES, LLC'S claims against AEG POWER SOLUTIONS GMBH for lack of jurisdiction. It is **ORDERED** that appellant AEG POWER SOLUTIONS GMBH recover its costs of this appeal from appellee CREATION TECHNOLOGIES, LLC.

Judgment entered this 12th day of November, 2019.